UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHRISTINE A. MERCURIO,

     Plaintiff,

v.

TOWN OF SHERBORN, DAVID BENTO,
LUKE TEDSTONE, JOHN COFFEY, and
MARK SCOLA.

     Defendants.

No. 15-cv-10714-DLC

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 57)

CABELL, U.S.M.J.

     This case arises from a police encounter that led to plaintiff Christine Mercurio's ("Mercurio" or "the plaintiff") arrest. She contends that Sherborn Police Department ("SPD") officers used excessive force and arrested her without cause and she has brought a multi-count civil rights suit against several SPD officers and the town of Sherborn ("the Town"). The defendants move for summary judgment. (Dkt. No. 57). The plaintiff opposes the motion and the matter has been fully briefed. (Dkt. No. 66). After careful consideration of the record, the parties' submissions, and the information adduced at a hearing on the motion, the motion for summary judgment is GRANTED IN PART and DENIED IN PART. The reasons for this ruling are explained below.

## I. RELEVANT FACTUAL BACKGROUND

### A. The Arrest

On March 15, 2012, shortly before 11:00 p.m., the plaintiff was driving with her husband, Mohammed Kimakhe ("Kimakhe"), on a portion of South Main Street in Sherborn. (Concise Statement of Undisputed Facts In Support of Defendants' Motion for Summary Judgment ("Defendants' SUF"), at ¶ 7). SPD Officers Mark Scola ("Scola") and David Bento ("Bento") were dispatched to that area at around the same time, based on a report from a caller that a crime had been committed or was in progress, and that the caller could hear two individuals arguing by the side of the road. (Defendants' SUF, at ¶¶ 14, 15); Plaintiff's Response to Defendants' Concise Statement of Undisputed Material Facts and Statement of Additional Undisputed Facts In Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's SUF"), at ¶¶ 14, 15). The parties agree that neither officer had previously met or interacted with the plaintiff. (Defendants' SUF, at ¶ 16). The parties also agree that an encounter took place between them when the officers arrived on scene, but offer conflicting versions of events.

### i. The Defendants' Version

According to the defendants, when Officers Scola and Bento arrived, Officer Scola saw the plaintiff standing outside of a car next to a male later identified as Kimakhe. (Id., at ¶ 17).

Officer Scola could hear the plaintiff yelling as he approached. (Id., at ¶ 18). Shortly thereafter, Officers Scola and Bento saw the plaintiff strike Kimakhe in the face with her fist. (Id., at ¶ 19).

The officers separated the couple and Officer Bento spoke with the plaintiff while Officer Scola spoke with Kimakhe. (Id., at ¶¶ 20, 22-23). According to Officer Scola, Kimakhe said that he and the plaintiff began to argue while they were driving down South Main Street. (Id., at ¶ 24). Kimakhe subsequently pulled the car over to the side of the road so the plaintiff could exit the car and call her father, Frank Mercurio, to come and pick her up. (Id.). Kimakhe admitted that the plaintiff punched him in the face but he said that he was fine and did not require any medical attention. (Id., at ¶ 23).

The plaintiff's father arrived soon afterwards and told Officer Scola that the plaintiff had called him for a ride because she and her husband were arguing. (Id., at ¶ 26). Upon hearing that the plaintiff and Kimakhe were married, Officers Scola and Bento deemed the plaintiff's conduct to constitute domestic violence warranting an immediate arrest under Massachusetts law, and accordingly decided to place her under arrest. (Id., at ¶¶ 27-28).

The officers informed the plaintiff that she was under arrest and instructed her to place her hands behind her back so they could

handcuff her wrists. (Id., at ¶¶ 29, 32). The plaintiff refused
to comply; the officers attempted to gain control of her wrists,
but she continued to resist by tightening her arms, shaking, and
twisting her body. (Id., ¶¶ 29, 32-33). The officers subsequently
brought the plaintiff to the ground and handcuffed her in the prone
position. (Id., ¶ 34). The officers then asked the plaintiff to
rise so she could walk to the police cruiser. (Id., ¶ 36). The
plaintiff refused to get into the cruiser and continued to resist
by moving sporadically, squirming, flailing her feet, and kicking.
(Id., at ¶¶ 37, 38). At some point, the plaintiff struck Officer
Scola in the face with a shoe. (Id., ¶ 39).

Officers Bento and Scola were eventually able to place the
plaintiff in the cruiser and close the door. (Id., ¶ 55). Still,
the plaintiff continued to be recalcitrant, and attempted to kick
out the rear window of the police cruiser. (Id., ¶ 56). The
officers chose not to secure the plaintiff in the back seat with
a seatbelt in light of the difficulties they encountered in
arresting her in the first place. (Id., ¶ 58).

*ii. The Plaintiff's Version*

The plaintiff avers that she and her husband were driving home
when she asked him to pull over to the side of the road so she
could get out and smoke a cigarette. (Id., at ¶ 24). Kimakhe
pulled over and they both stood outside the car while the plaintiff
smoked a cigarette. (Id., at ¶¶ 17, 24). The plaintiff and

4

Kimakhe were conversing normally when Officers Bento and Scola arrived. (Id., at ¶ 18). The plaintiff denies that she punched Kimakhe in the face. (Id., at ¶ 19). Kimakhe also testified in his deposition that, contrary to Officer Scola's report, the plaintiff never struck him, and he did not have any apparent injuries. (Id., at ¶ 23). Nonetheless, Officers Scola and Bento separated the plaintiff and Kimakhe and questioned each of them separately. While the officers were doing so, Frank Mercurio arrived and in due course told Officer Scola that the plaintiff and Kimakhe were married. (Id., at ¶¶ 20, 26).

Following this exchange with Frank Mercurio, Officers Scola and Bento accused the plaintiff of striking Kimakhe in the face and suddenly threw her to the ground without warning or an opportunity to respond to the accusation. (Id., at ¶¶ 29, 32). Prior to throwing her to the ground, neither officer tried to handcuff the plaintiff or ever informed her that she was under arrest. (Id., ¶¶ 33, 34). The plaintiff did not struggle or otherwise resist arrest prior to being taken to the ground. (Id., at ¶ 35).

Once they brought her to the ground, Officers Bento and Scola placed their knees on the plaintiff's back in an effort to hold her down, handcuffed her, and then "dragged" her to the police cruiser, where she was "thrown" into it "like a duffle bag." (Id., at ¶¶ 32, 36, 37). And, because the officers failed to secure the

plaintiff with a seat belt, she was "thrown around the back of the police car" as the car moved. (Id., at ¶¶ 56, 58).

According to Frank Mercurio, the plaintiff was initially "squirming around" but she never resisted arrest and she did not hit Officer Scola in the face with a shoe. (Id., at ¶¶ 39, 40, 55, 57).

## B. <u>The Booking Process</u>

The parties agree that when the officers brought the plaintiff to the Sherborn police station for booking, she complained of pain in her thumb and was given an ice pack. (Plaintiff's SUF, at ¶ 59). Officer Scola, however, did not observe any physical injuries on the plaintiff. (Defendants' SUF, at ¶ 59). Officers then handcuffed the plaintiff to a "Murphy bar" and instructed her to sit in a rolling chair and answer questions through a glass window. (Defendant's SUF, at ¶¶ 62, 68; Plaintiff's SUF, at ¶¶ 62, 68).

The defendants claim that the plaintiff was uncooperative and continued to resist and kick at the officers but the plaintiff disputes this assertion and maintains that she was initially cooperative and answered the booking questions asked of her. (Defendants' SUF, at ¶ 69; Plaintiff's SUF, at ¶¶ 69, 84). Still, both parties agree that at some point during the booking process the plaintiff began hitting the glass window in an effort to get the officers' attention. (Defendants' SUF, at ¶ 63; Plaintiff's SUF, at ¶ 63). The plaintiff also made several remarks to the

effect that she was contemplating suicide and would take her own life by any means necessary. (Defendants' SUF, at ¶¶ 70, 85).[1] Based on these remarks, the defendants called for an ambulance to transport the plaintiff to the hospital for a psychiatric evaluation. (Defendants' SUF, at ¶¶ 71, 86, 88; Plaintiff's SUF, at ¶ 71).

According to the defendants, the plaintiff became increasingly agitated once the ambulance arrived and threatened to "fight" any officer who attempted to move her onto the stretcher. (Defendants' SUF, at ¶¶ 74, 96, 98). The plaintiff disputes this contention and maintains that she sat calmly with her head down on the Murphy bar, and at no point indicated that she would resist being transported to the hospital. (Plaintiff's SUF, at ¶¶ 74, 81, 96, 98).[2]

Regardless, the parties agree that SPD Officer Tedstone pulled the chair from under the plaintiff while she was still handcuffed to the Murphy bar, causing her to fall to the ground. (Defendants' SUF, at ¶¶ 73, 75, 102; Plaintiff's SUF, at ¶¶ 73, 102, 104). The parties also agree that once the plaintiff fell to the ground, she became increasingly combative with the officers

---

[1] The plaintiff, while not actually disputing this assertion, maintains that she does not independently recollect having made any suicidal statements. (Plaintiff's SUF, at ¶ 70).

[2] As support for this assertion the plaintiff cites to the SPD booking video. (Dkt. No. 67-1, Ex. 7). However, the video does not contain any audio so it is impossible to determine whether the plaintiff verbally objected to being moved onto the stretcher.

attempting to move her onto the stretcher, by flailing her arms and legs, biting, spitting, scratching, and kicking at those around her. (Defendants' SUF, at ¶¶ 77, 78, 90; Plaintiff's SUF, at ¶¶ 77, 78, 90). The plaintiff ultimately was placed in a four point restraint on the stretcher and transported to a local hospital. (Defendants' SUF, at ¶¶ 79, 93; Plaintiff's SUF, at ¶¶ 79, 93).

## C. **State Court Proceedings**

The plaintiff was subsequently charged in state court with several criminal offenses. (Defendants' SUF, at ¶ 113; Plaintiff's SUF, at ¶ 113). The criminal case was dismissed based on an opinion from the plaintiff's psychiatrist that the plaintiff was suffering from an acute psychotic episode at the time of the incident and was therefore not criminally responsible for her actions. (Defendants' SUF, at ¶¶ 108, 110; Plaintiff's SUF, at ¶¶ 108, 110).

## D. **The Plaintiff's Mental Health History**

In early 2002 the plaintiff was diagnosed with major depression with psychotic features; she has attempted suicide at least four times since then. (Defendants' SUF, at ¶¶ 2, 4; Plaintiff's SUF, at ¶¶ 2, 4). The plaintiff's condition causes her to experience psychotic episodes during unpleasant or traumatic events. (Defendants' SUF, at ¶ 6; Plaintiff's SUF, at ¶ 6). During such episodes, the plaintiff hallucinates a male figure that unleashes an army of cockroaches that will bite and

ultimately kill her.  (Defendants' SUF, at ¶ 5; Plaintiff's SUF, at ¶ 5).

The parties disagree as to when SPD officers first learned that the plaintiff suffers from a mental illness.  The plaintiff maintains that Frank Mercurio told Officers Scola and Bento immediately prior to her arrest that the plaintiff suffers from a mental illness, and pleaded with them to allow him to transport her to a nearby hospital for an evaluation.  (Plaintiff's SUF, at ¶ 41).  The defendants state that they did not learn of the plaintiff's mental illness until sometime after arresting her. (Defendants' SUF, at ¶ 41).

Regardless, the plaintiff claims that she experienced a psychotic episode when Officer Scola and Bento threw her to the ground so they could handcuff her wrists.  (Defendants' SUF, at ¶ 43; Plaintiff's SUF, at ¶ 43).  As a consequence, the plaintiff was "in and out of reality" for the remainder of the evening and could not remember portions of that evening.  (Defendants' SUF, at ¶¶ 44, 45; Plaintiff's SUF, at ¶¶ 44, 45, 53).

## II.  THE COMPLAINT

The complaint contains nine counts.  Count I alleges that all of the individual defendants used excessive force, in violation of 42 U.S.C. § 1983.

Count II alleges that the Town of Sherborn failed to train and supervise its police officers on the proper use of force in violation of 42 U.S.C. § 1983.

Count III alleges that the defendants conspired to violate 42 U.S.C. § 1983.

Count IV alleges that the defendants violated the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I.

Count V alleges false arrest against Officers Bento and Scola.

Count VI alleges malicious prosecution against all defendants.

Count VII alleges that the Town of Sherborn has "vicarious liability" for the acts and omissions of all of the individual defendants.

Count VIII alleges intentional infliction of emotional distress against all of the defendants.

Finally, Count IX alleges negligence against Officer Tedstone.

## III. LEGAL STANDARD

When the Court is presented with a motion for summary judgment, it shall grant it "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that

assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). Once the moving party meets that burden, in order to avoid summary judgment, the opposing party must "show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (*quoting Ingram v. Brink's, Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005)). Indeed, the opposing party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (*quoting Triangle Trading Co. v. Robroy Indus. Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

When determining whether summary judgment is appropriate, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* (*citing Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000)). The Federal Rules require "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986) (citing Fed. R. Civ. P. 56)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted).

## IV.  ANALYSIS

As a threshold matter, the complaint names SPD Officer John Coffey as a defendant but fails to allege any facts implicating him in any aspect of the plaintiff's arrest and/or subsequent treatment.  Similarly, the facts – both the undisputed and disputed ones - evince no hint of Officer Coffey's participation in any of the underlying events, and the plaintiff was not able at oral argument to articulate any act or omission by Officer Coffey that might otherwise bring him within the scope of any of the plaintiff's claims.  The record thus demonstrates Officer Coffey's entitlement to summary judgment on the merits as to all claims against him.  With respect to the remainder of the defendants, the court reasons and rules as follows.

### A. Count I – Section 1983 Excessive Force Claim

*i.  The Claim*

Count I alleges under 42 U.S.C. § 1983 that SPD officers violated the plaintiff's constitutional rights by using excessive force both during and after her arrest.  More specifically, the

plaintiff contends that Officers Bento and Scola used excessive force during her arrest when they threw her to the ground, placed their knees on her back to handcuff her, and dragged her to the police cruiser. She contends that Officer Tedstone also used excessive force during the booking process when he pulled a chair out from under the plaintiff while she was handcuffed to the Murphy bar, which caused her to fall to the floor.

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). In order to prevail under section 1983, a plaintiff must show that the defendants (1) acted under "color of state law," and (2) deprived [the] plaintiff of a right secured by the Constitution or the laws of the United States. *Budnick v. Baybanks, Inc.*, 921 F. Supp. 30, 32 (D. Mass. 1996).

Where, as here, an excessive force claim "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons . . . against unreasonable . . . seizures." *Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 51 (1st Cir. 2005). But, because "Fourth Amendment jurisprudence has long recognized that the right to make an arrest [or seizure] necessarily carries with it the right to use some degree of physical coercion or threat

thereof to effect it," *see Nolan v. Krajcik*, 384 F. Supp. 2d 447, 463 (D. Mass. 2005)(*quoting Graham*, 490 U.S. at 396), the relevant inquiry "is whether the force used was objectively reasonable under all the circumstances, that is, whether it was consistent with the amount of force that a reasonable police officer would think necessary to bring the arrestee into custody." *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir. 1990). In making such a determination, the court should weigh "three non-exclusive factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010).

With respect to the plaintiff's arrest, the defendants argue that Officer Bento and Scola used an objectively reasonable amount of force when they arrested the plaintiff because she actively resisted arrest by tightening her arms, shaking, and twisting her body. Assuming *arguendo* that such conduct on the plaintiff's part would justify the officers' use of force, there is as noted above a genuine dispute as to whether the plaintiff physically resisted arrest. In particular, the plaintiff has, aside from her own testimony, presented evidence that she did not resist arrest through the deposition testimony of Frank Mercurio and Kimakhe, both of whom were present at the time of the arrest. There is no

real dispute that the officers would not have been justified in forcibly placing the plaintiff on the ground and dragging her to the police car if she was already under control and not resisting. *See e.g., Plumhoff v. Rickard,* 134 S. Ct. 2012, 2022 (2014) (finding that it was reasonable for police to fire fifteen shots during a high speed chase, but noting that it would be a "different case" if the police had kept using force after the suspect was incapacitated); *Jennings v. Jones,* 499 F.3d 2, 15-16 (1st Cir. 2007) (denying summary judgment because a reasonable jury could find that police officer defendant increased pressure on plaintiff's ankle after he stopped resisting, which would amount to excessive force under the circumstances); *Huckins v. McSweeney*, No. 11-cv-106-JD, 2012 WL 3308395, *3 (D.N.H. Aug. 13, 2012) (testimony that defendant deployed taser after plaintiff was already on ground raised triable issue of fact regarding whether defendant used excessive force).  Accordingly, there is a material dispute of fact as to whether the officers used reasonable or excessive force in arresting the plaintiff, rendering summary judgment inappropriate.

With respect to the post arrest events at the police station, the defendants argue similarly that Officer Tedstone did not use excessive force when he pulled the chair out from under the plaintiff, because the plaintiff refused to get onto a stretcher despite Officer Tedstone's repeated requests.  The plaintiff

denies that she was uncooperative.  A stationhouse video camera
captured the incident but there was no audio to indicate what if
anything Officer Tedstone or any of the several other individuals
present said to the plaintiff, or what if anything she said to
them.  Consequently, even though there is no dispute that Officer
Tedstone caused the plaintiff to fall when he deliberately pulled
the chair out from under her, there is a dispute as to whether the
plaintiff was acquiescent or resistant.  Because a jury could
conclude that Officer Tedstone used excessive force if it found
that the plaintiff was not resisting, summary judgment is
inappropriate on this prong of the excessive force claim as well.

   *ii.  Qualified Immunity*

   The defendants argue that they enjoy qualified immunity for
their conduct even if they used excessive force.  "The doctrine of
qualified immunity shields officials from civil liability so long
as their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known."  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*quoting*
*Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  In determining
whether a defendant is entitled to qualified immunity, a court
should consider: "(1) whether the facts alleged or shown by the
plaintiff make out a violation of a constitutional right; and (2)
if so, whether the right was clearly established at the time of
the defendant's alleged violation."  *Ciolino v. Gikas*, 861 F.3d

296, 303 (1st Cir. 2017).  The second prong has two components:
"(a) whether the legal contours of the right in question were
sufficiently clear that a reasonable officer would have understood
that what he was doing violated the right, and (b) whether in the
particular factual context of the case, a reasonable officer would
have understood that his conduct violated the right."  *Id*.

Applied here, and considering the facts in the light most
favorable to the plaintiff as the non-moving party, the relevant
inquiry is (1) whether the officers should have known that using
strong physical force to arrest and then transport for treatment
a non-resistant suspect violated the suspect's right to be free of
excessive force; and, if so, (2) whether a reasonable officer would
have understood that his conduct violated the right.

Regarding the plaintiff's arrest, it is a close call, but the
court concludes that even if Officers Scola and Bento used
excessive force to subdue the plaintiff by bringing her to the
ground so they could handcuff her wrists, that use of force was
not so clearly excessive that a reasonable officer would know it
violated the plaintiff's constitutional rights.  In that regard,
there is no evidence or suggestion that either officer was seeking
to harm the plaintiff or to do anything other than effect an
arrest.

However, once the officers reportedly had the plaintiff on
the ground in handcuffs, that is, under control, if they then

dragged her along the ground and threw her into the car, that wouuld be a different matter. A police officer may not use unreasonable force on someone who is restrained and who has ceased resisting, and the right to be free from such force was clearly established at the time of this incident in 2012. *See e.g., Alexis v. McDonald's Rests. of Mass., Inc*., 67 F.3d 341, 353 (1st Cir. 1995)(finding triable excessive force claim where officer dragged non-resisting plaintiff from restaurant booth and pushed her into police car even though the plaintiff posed no risk of flight and was not resisting). Thus, a reasonable officer in Officers Bento and Scola's positions would have understood that such conduct was a violation of the plaintiff's rights.

The court concludes similarly with respect to Officer Tedstone. If in fact the plaintiff, who was handcuffed to the Murphy bar, was not resisting or acting uncooperatively when Officer Tedstone approached her and pulled the chair out from under her, it would seem apparent to any reasonable officer that such conduct would be a violation of the plaintiff's rights.

Consequently, where there is a genuine dispute of fact as to whether the officers used excessive force once the plaintiff was on the ground and in handcuffs, the defendants are not entitled to qualified immunity.

**B. Count II - The *Monell* Claim**

Count II alleges under 42 U.S.C. § 1983 that the town of Sherborn (1) failed to train its police officers on how to properly effect an arrest where the arrestee may have a mental health illness, and (2) failed to investigate instances of alleged police misconduct. Neither theory of liability is tenable here because the plaintiff has failed to adduce any evidence of such policy related failures.

"[L]ocal governments can be held liable for alleged unconstitutional deprivations when those deprivations arise from a government policy or practice." *Cox v. Murphy*, No, 12-11817-FDS, 2016 WL 4009978, at *7 (D. Mass. Feb. 12, 2016) (*citing Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978)). Thus, a plaintiff is required to demonstrate that "(1) the municipality had a custom, policy, or practice of failing to investigate, discipline, supervise, or train its officers; (2) this custom, policy, or practice was such that it demonstrated a deliberate indifference to the rights of those citizens with whom its officers came into contact; and (3) the custom, policy, or practice was the direct cause of the alleged constitutional violation." *Cox*, 2016 WL 4009978 at *7 (*citing DiRico v. City of Quincy*, 404 F.3d 464, 468-69 (1st Cir. 2005)).

With respect to the failure to train officers on how to properly deal with suspects with mental health issues, the

plaintiff points in broad fashion to the general deposition testimony of Officers Bento, Scola, and Tedstone, but tellingly was not able when pressed to refer to any specific testimony supporting her claim of a systemic failure to train officers. In that regard, the court has also reviewed the officers' deposition testimony and finds in it no evidence to suggest that the town of Sherborn failed to promulgate appropriate protocols or properly train its police officers how to proceed in confrontations with suspects who may have a mental health issue or illness. Accordingly, as the plaintiff has failed to adduce evidence of a relevant custom or policy, let alone a policy responsible for the plaintiff's alleged maltreatment, summary judgment must enter in the Town's favor on this ground. *Murphy v. City of Newton*, No. 15-12694, 2017 WL 6329614, at 9 (D. Mass. Dec. 11, 2017)(noting that the plaintiff's failure to identify "a specific policy or custom responsible for the deprivation of his constitutional rights . . . is fatal to his [Monell] claim.").

A similar fate for similar reasons befalls the plaintiff's claim of a municipal policy of failing to investigate instances of alleged police misconduct. The plaintiff contends that Officer Scola's police report from the incident provides evidence of such a failure because it does not mention Officer Tedstone's alleged misconduct in pulling the chair from under the plaintiff. The plaintiff reasons that an officer's report should properly report

on another officer's misconduct and that, assuming Officer Tedstone's conduct amounted to misconduct, Officer Scola's report should have mentioned it. Because it did not, so the plaintiff argues, the omission should be seen as prima facie evidence of a "code of silence" among the SPD and the Town to bury instances of misconduct. The court rejects this argument. Assuming *arguendo* that Officer Scola (or some other officer) should have appropriately mentioned the chair incident in his report, it just does not follow that the failure to do so necessarily evinces a municipal policy to conceal such incidents from the public light or scrutiny. Indeed, Officer Scola might have plausibly simply forgotten to include the incident, or may have determined that it was not significant enough to include in his report. Without more evidence, the plaintiff's speculative conjecture is insufficient to allow this claim to proceed further. *Grassia v. Piers*, 735 F. Supp. 2d 1, 10 (D. Mass. 2010)(granting summary judgment on the Monell claim where the plaintiff's theory of liability was "conclusory"). In short, the Town is entitled to summary judgment on Count II.

## C. Count III - Conspiracy

Count III alleges that the defendants conspired to violate the plaintiff's constitutional rights. A plaintiff alleging a conspiracy claim under section 1983 must show "a combination of two or more persons acting in concert to commit an unlawful act,

or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008). "While a conspiracy may be established by implication through circumstantial evidence, summary judgment is warranted where the non-moving party relies solely on conclusory allegations and presents no evidence, either direct or circumstantial of an agreement among defendants from which a reasonable jury could [infer the existence of] a conspiracy among them." *Turkowitz v. Town of Provincetown*, 914 F. Supp. 2d 62, 74 (D. Mass. 2012).

That is the case here. The crux of the plaintiff's conspiracy claim, in essence, is that all of the individual defendants must have participated "in concert" because they were all around when the arrest and booking took place. (Dkt. No. 72). Without more, such a conclusory assertion is just not enough to maintain a viable conspiracy claim beyond summary judgment. *See e.g., Martin v. Unknown U.S. Marshals,* 965 F. Supp. 2d 502, 547 (D.N.J. 2013)("[I]t is not enough . . . that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism . . . [r]ather the plaintiff bears the burden of showing that the alleged conspirators reached an understanding, or had a meeting of the minds to violate his rights."); *Deakins v. Pack*, 957 F. Supp. 2d

703, 760 (S. D. W. Va. 2013)(granting summary judgment on the conspiracy claim where plaintiff failed to produce any evidence showing that the defendants conspired to use excessive force and to remain silent); *DeMeo v. Kean*, 754 F. Supp. 2d 435, 446 (N.D.N.Y. 2010)(granting summary judgment where the plaintiff failed to show "any discussion, offer to assist, request for assistance, or other indication of an agreement" between the defendants). Summary judgment will therefore enter for the defendants on Count III.

### D. Count IV - MCRA

Count IV alleges that the defendants' collective conduct violated the Massachusetts Civil Rights Act, M.G.L. c. 12, §11I ("MCRA"). Under the MCRA, "persons" who either attempt to, or actually do "interfere by threats, intimidation or coercion" with another person's "exercise or enjoyment" of a state or federal constitutional right violate the statute. M.G.L. c. 12, § 11H; *Titus v. Town of Nantucket*, 840 F. Supp. 2d 404, 416 (D. Mass. 2011). Where, as here, the MCRA claim is asserted alongside a section 1983 claim, the "plaintiff must establish threats, coercion, or intimidation *in addition* to a constitutional violation." *Santiago v. Keyes*, 890 F. Supp. 2d 149, 155 (D. Mass. 2012)(emphasis in original).

Applied here, Count IV fails as alleged against the Town because the MCRA applies to "persons" only, and not municipalities,

and the Town therefore cannot be held liable for violating the statute. *See Watson v. Mita*, No. 16-40133-LTS, 2017 WL 4365986, at *3 (D. Mass. Sept. 29, 2017) ("it is well settled that a municipality cannot be held liable under the [MCRA]").

As to the individual defendants, they argue that the MCRA claim fails because their conduct did not involve any threats, coercion, or intimidation. The plaintiff argues that she has produced evidence of coercive or threatening behavior where she has produced evidence that Officers Bento and Scola used excessive force to get her to "surrender" to the arrest.

However, even accepting that any arrest attended by force is intrinsically coercive, "there still must be under MCRA some allegation that the defendant's conduct was intended to coerce [the plaintiff] into refraining from the exercise of a right or privilege secured by law." *Barbosa v. Conlon*, 962 F. Supp. 2d 316, 332 (D. Mass. 2013). Resisting the arrest itself cannot constitute the requisite "right or privilege" in this context, even if the suspect believes the arrest is illegal, because "[t]here is no right under state or federal law to resist an arrest or search, even one that is illegal from its inception." *Farrah*, 725 F. Supp. 2d at 248. For that reason, the majority of courts have held that an allegation of excessive force or wrongful arrest does not, standing alone, give rise to a claim under the MCRA. *Ciolinio v. Eastman*, 128 F. Supp. 3d 366, 380 (D. Mass. 2015).

Accordingly, although the plaintiff here has adduced sufficient evidence to proceed to trial on a claim of excessive force, that same evidence is insufficient by itself to sustain a claim under the MCRA. *See e.g., Ciolino,* 128 F. Supp. 3d at 381 (allowing excessive force claim to go forward but granting summary judgment on MCRA claim where plaintiff failed to produce evidence of threats, intimidation or coercion); *Titus*, 840 F. Supp. 2d at 416 (same); *Orwat v. Maloney*, 360 F. Supp. 2d 146, 164 (D. Mass. 2005)(same). Judgment will therefore enter in the defendants' favor on Count IV.

## E. Count V - False Arrest

Count V alleges a claim of false arrest against Officers Scola and Bento. The court finds that there are disputes of fact material to the plaintiff's false arrest claim, rendering summary judgment inappropriate.

Under Massachusetts law, a plaintiff alleging false arrest must show in order to prevail that "(1) the defendant[s] intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the defendant had no privilege to cause the confinement." *Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 3 n.6 (1st Cir. 1995). However, "unlike a section 1983 claim, the defendant in a false arrest claim based upon a warrantless arrest bears the burden of proving the presence of probable cause to justify the arrest."

*Felix v. Lugas*, No. CIV. A. 00-122250-DPW, 2004 WL 1775996, at *6 (D. Mass. Mar. 2, 2004). Probable cause to arrest exists when the facts and circumstances known to the police officers at the moment of the arrest were sufficient to warrant a person of reasonable caution in believing that the defendant had committed or was committing a crime. *Jenkins v. Chief Justice of the District Court Dept.*, 416 Mass. 221, 242 (1993). "The probable cause standard is a relatively low threshold for police officers to establish." *Barbosa*, 962 F. Supp. 2d at 334-35.

In the instant case, Officers Bento and Scola insist that they saw the plaintiff strike her husband in the face, which in turn gave them probable cause to arrest her for assault. Contrarily, the plaintiff has adduced evidence through her own testimony as well as that of Kimakhe that she did not strike him in the face. Consequently, summary judgment is not appropriate because the conflicting versions of events raise a genuine issue as to whether the plaintiff struck her husband and thereby gave the police officers probable cause to arrest her. *Eason v. Alexis*, 824 F. Supp. 2d 236, 241 (D. Mass. 2011); *see also Davila-Lynch v. City of Brockton*, No. 09-10817-RGS, 2011 WL 4072092, at *5 (D. Mass. Sept. 12, 2011)(dispute as to whether suspect was intoxicated or not at the time of the arrest precluded summary judgment as to probable cause). The motion for summary judgment is therefore denied with respect to Count V.

**F. Count VI - Malicious Prosecution**

Count VI alleges a claim of malicious prosecution against all defendants. In order to prevail on such a claim a plaintiff must show: "(1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice." *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001). "In broad brush, an individual may be said to have instituted criminal proceedings against another if he caused those proceedings to be initiated." *Limone v. U.S.*, 579 F.3d 79, 89 (1st Cir. 2009). Generally, this is found where the defendant "induces another person to lodge formal criminal charges," and "exercises a peculiar degree of control over the charging official or adamantly presses that official to bring a criminal complaint." *Id.* The plaintiff contends that the defendants instituted criminal proceedings against her with malice and without probable cause, and she notes in particular that all charges lodged against her following her arrest were subsequently dismissed. The claim is without merit.

The claim fails against the Town because a municipality as a public employer is immune from suit under the Massachusetts Torts Claim Act (MTCA) for the intentional torts of its employees acting

within the scope of their duties. M. G. L. c. 258, § 10; *Petricca v. City of Gardner*, 429 F. Supp. 2d 216, 224 (D. Mass. 2006).

The claim fails against the SPD officers because the plaintiff has not adduced any evidence to suggest that the defendants initiated the criminal charges against the plaintiff, or that they induced the entity that did – the Middlesex County District Attorney's Office – to initiate charges against her, or that the defendants exercised any control over the prosecutor's office. *See Kennedy v. Town of Billerica,* 502 F. Supp. 2d 150, 160 (D. Mass. 2007)(granting summary judgment on malicious prosecution claim where there was no evidence that defendant officers were responsible for instituting criminal proceedings); *Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 215 (D. Mass. 2001)(granting summary judgment on malicious prosecution claim where there was no evidence that arresting officers did anything beyond arresting and booking of plaintiff); *compare, Petricca*, 429 F. Supp. 2d at 225 (denying summary judgment where plaintiff produced evidence that city commissioner knowingly falsified statements under oath in support of criminal complaint).

Summary judgment will therefore be granted for all defendants on Count VI.

G. **Count VII - Vicarious Liability**

Count VII of the complaint is entitled "vicarious liability" and seeks to hold the Town liable for the acts of the individual

defendants. Under the doctrine of respondeat superior, a municipality may be held vicariously liable for the negligent acts or omissions of its employees carried out within the scope of their employment. *Petrell v. Shaw*, 453 Mass. 377, 384 (2009). However, vicarious liability is a theory of liability; it is not in and of itself an independent cause of action. *See II Palazzo Corp. v. City of Worcester*, No. 031022, 2009 WL 2506267, at *3 (Mass. Sup. Ct. 2009)("the claim of respondeat superior is not an independent cause of action upon which relief can be granted"). Count VII therefore fails to assert a valid claim and summary judgment will be granted on Count VII.

## H. Count VIII - Intentional Infliction of Emotional Distress

Count VIII alleges that the defendants intentionally inflicted emotional distress on the plaintiff by virtue of their maltreatment of her during the arrest and booking process. In order to prevail on a claim of intentional infliction of emotional distress, a plaintiff must show that: "(1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress would likely result, (2) the defendant's conduct was extreme and outrageous to the extent that it was utterly intolerable in a civilized society, (3) the defendant's conduct caused the plaintiff's distress, and (4) the plaintiff sustained severe emotional distress." *Johnson v. Town of Nantucket*, 550 F. Supp. 2d 179, 183 (D. Mass. 2008).

With respect to the Town, the claim fails on its face because the Town is immune from suit under the MTCA for the intentional torts of its employees. *Canales v. Gatzunis*, 979 F. Supp. 2d 164, 175 (D. Mass. 2013)(dismissing the plaintiff's intentional infliction of emotional distress claim as alleged against the municipality on the grounds that the municipality is immune from suit for the intentional torts of its employees under the MTCA).

The claim survives summary judgment against the officers, however. As noted above, the plaintiff has adduced evidence that the officers arrested her without cause and used excessive force, and the plaintiff's psychiatrist, Dr. Kate Irwin,[3] opined in a report that the plaintiff was traumatized as a result of the events. Because a jury could conclude from these facts that the officers intended by virtue of their conduct to inflict emotional distress upon the plaintiff, summary judgment is inappropriate. *See Poy v. Boutselis*, 352 F.3d 479, 485-86 (1st Cir.

---

[3] The defendants object to the court's consideration of Dr. Erwin's report on various grounds, including that the plaintiff provided the court with a different version of Dr. Erwin's report than she provided to the defendants. In particular, the version given to the defendants contains a paragraph setting forth Dr. Erwin's opinion that the SPD officers who interacted with the plaintiff "failed to recognize mental health symptoms" when they first encountered the plaintiff, and "compounded" her trauma with their "excessive physical control" of the plaintiff, which was moreover "exacerbated when the chair was pulled out from underneath her while she was handcuffed to the Murphy bar." That paragraph does not appear in the version submitted to the court. The dissonance between the two versions, while concerning, does not bear on the court's summary judgment analysis so it is not necessary at this specific point to determine how or why this happened. Should the plaintiff seek to have Dr. Erwin testify at trial, however, further inquiry may be appropriate if not unavoidable.

2003)(upholding jury verdict in favor of plaintiff's intentional infliction of emotional distress claim where defendants used excessive force in arresting plaintiff).

## I. Count IX - Negligence

Count IX alleges that Officer Tedstone acted negligently when he removed the chair from under the plaintiff and caused her to fall to the floor. This claim fails as a matter of law, though, because the MTCA shields a public employee from liability "for any injury or loss of property or of personal injury or death caused by his negligent or wrongful act or omission acting within the scope of his office or employment." M.G.L. c. 258, § 2. As there is no dispute here that Officer Tedstone was acting within the scope of his employment at the time of the relevant events, he is shielded from liability and entitled to summary judgment.

## V.    CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment (Dkt. No. 57) is GRANTED IN PART and DENIED IN PART. Specifically, the motion for summary judgment is granted in favor of the Town and the individual defendants on Counts II, III, IV, VI, VII and IX, and in whole as to Officer Coffey. The motion is granted on Count I (excessive force claim) with respect to all of the events occurring up the point the plaintiff was placed in handcuffs, but denied with respect to all of the events following the plaintiff's arrest, that is, the events occurring after she

was placed on the ground in handcuffs.  The motion is denied as to Count V (false arrest) and Count VIII (intentional infliction of emotional distress).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  December 19, 2017